1

2

3

4

5

6            UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
7                    AT SEATTLE

8    JEFFERY CURTIS MARBLE,

9                          Petitioner,          Case No. C15-142-RSL-JPD

10          v.

11   PATRICK GLEBE,                              REPORT AND RECOMMENDATION

12                          Respondent.

13

14          INTRODUCTION AND SUMMARY CONCLUSION

15          Petitioner is a state prisoner who is currently confined at the Stafford Creek Corrections

16   Center in Aberdeen, Washington.  He has filed a petition for writ of habeas corpus under 28

17   U.S.C. § 2254 seeking relief from a 2010 Snohomish County Superior Court judgment and

18   sentence.[1]  Respondent has filed an answer to the petition and has submitted relevant portions of

19   the state court record.  Petitioner has filed a response to respondent's answer.

20

21          _____
            [1] Petitioner's original habeas petition (Dkt. 8) was deemed defective because petitioner failed to sign the
22   petition and he failed to name a proper respondent.  This Court therefore declined to serve petitioner's original
     petition, but granted him leave to amend.  (*See* Dkt.7.)  Petitioner filed an amended petition correcting the noted
     deficiencies in April 2015 (Dkt. 9), but he did not identify in his amended petition any grounds for relief.  Instead,
23   petitioner referred the Court back to the memorandum of points and authorities petitioner submitted with his original
     petition in which he set forth his grounds for relief and his arguments in support thereof.  (*See* Dkt. 8, Memorandum

REPORT AND RECOMMENDATION - 1

The Court, having carefully reviewed petitioner's petition, the briefs of the parties and the balance of the record, concludes that petitioner's amended petition for writ of habeas corpus should be denied and this action should be dismissed with prejudice.

<u>FACTUAL BACKGROUND</u>

The Washington Court of Appeals, on direct appeal, summarized the facts underlying petitioner's conviction as follows:

> In 2009, Jeffery Marble lived in Everett with his wife, Catherine Dunne-Marble, and their son, Gavin.[2]  On Friday, May 29, a man came to their house and told them the house was in foreclosure and would be sold at auction.  Surprised by this news, Catherine asked Jeffery about it.  He told her there was a mistake and the house was not in foreclosure.[3]
>
> On Monday, June 1, Gavin left for school around 6 a.m.  Catherine felt too ill to go to work, but around 8 or 9 a.m. she decided to go to the bank to ask about the mortgage.  She told Jeffery where she was going and he became "slightly agitated."  Catherine started down the stairs to the carport and twice felt a hand push her.  She asked Jeffery what he was doing, and he said he was not doing anything.[4]  She continued down a few more steps and Jeffery grabbed her back, saying they were not going to the bank until they "had sorted this issue out about [Catherine] saying that he pushed [her] down the stairs."  Report of Proceedings (RP) (Aug. 23, 2010) at 51.
>
> Catherine testified that Jeffery knocked a cordless phone and a cell phone out of her hand as she attempted to call 911.  She then felt a blow to her head, followed by more blows.  She estimated the first blow occurred around 10 or 11 a.m.  She realized Jeffery was hitting her with a barbell.
>
> Catherine tried to run out the front door.  Jeffery blocked the door and dragged her back.  Catherine testified that Jeffery continued to attack her.  He hit her with the barbell 30 to 40 times, pinned her down and bashed her head on the

---

of Points and Authorities.)  Thus, while petitioner's amended petition is technically the operative petition in this matter, reference to petitioner's original materials is necessary in order to understand the substance of his claims.

[2]  [Court of Appeals footnote 1]  For clarity, we use the parties' first names.  Jeffery and Catherine are now divorced.

[3]  [Court of Appeals footnote 2]  The couple had previously argued over finances.

[4]  [Court of Appeals footnote 3]  Jeffery denied pushing Catherine.  During the interview with Detective Timothy O'Hara, he claimed he grabbed her to keep her from falling.

REPORT AND RECOMMENDATION - 2

floor, and pushed her against iron railings in the hallway.  Catherine said the attack was not continuous and Jeffery stopped hitting her at times due to exhaustion.  She also testified that Jeffery hit himself in the head four or five times.

After a while, Catherine escaped to the bathroom, where the attack continued.  Jeffery let her go for "a second" and she tried to escape through the bathroom window.  He pulled her back and resumed hitting her with the barbell.  Catherine testified Jeffery "would kind of like collapse in front of the bathroom door so [she] couldn't get out, then he would get back up again and start striking . . . [a]s soon as [she] made an attempt to get to the door."  RP (Aug. 23, 2010) at 59.  She yelled for help and used her car keys to set of her car alarm, but no one responded.[5]

Gavin returned home between 4:30 and 5:00 p.m.  He heard Catherine yelling for help and saw blood in the house.  Gavin went to the bathroom and found Jeffery pinning Catherine against the bathroom wall.   Gavin saw a barbell on the bathroom counter.  Gavin lifted Jeffery off Catherine.  Catherine ran out of the house, and Gavin followed her and called 911.

Catherine went to the emergency room after the attack.  Forensic nurse Paula Skomski examined her.  Catherine was bloodied and her face, head, neck, torso, and limbs were bruised, cut, and swollen.  A piece of metal was removed from her eyelid.  Skomski said Catherine's injuries were consistent with the incident she described.

Detective Timothy O'Hara searched the house on June 1.  He saw blood on the floor, walls, stairs, and stair railings.  He also found guns on the floor in Jeffery's office and a note signed by Jeffery stating that he was responsible for all financial debt incurred during his marriage to Catherine.  On June 3, O'Hara interviewed Jeffery in the hospital.  During the interview, Jeffery said he had blacked out during the incident and could not remember what happened.  Jeffery also said he "couldn't believe what he had done to Catherine."  He admitted having financial troubles and said "he pretty much sheltered Catherine from that, and she didn't know anything about it."  RP (Aug. 24, 2010) at 208.

Catherine later discovered that the mortgage had not been paid in over a year, the house was in foreclosure, the car note had not been paid, and some household bills had not been paid for several months.  She testified she had only seen "intermittent bills" for a year or more prior to the June 1 incident.  After the incident, while cleaning out the garage, she found several large garbage bags

---

[5] [Court of Appeals footnote 4] Karen White, a responding police officer, testified that she walked through the house and found car keys on the bathroom counter.  White also testified that an unidentified neighbor told her about hearing the car alarm going off repeatedly on the day of the attack.

REPORT AND RECOMMENDATION - 3

filled with bills and other mail.  She also found checks endorsed and cashed in her name, but she knew nothing about the checks and the handwriting on them was not hers.

The State charged Jeffery with first degree assault and unlawful imprisonment, each with a deadly weapon enhancement.  A jury convicted him as charged.  At sentencing, the court counted the two crimes as current offenses and scored them against each other, yielding an offender score of 1 for each crime.  This resulted in a standard sentence range of 102 to 136 months for the first degree assault and 3 to 8 months for the unlawful imprisonment (served concurrently).  The weapon enhancements added 24 months to the assault and 6 months to the unlawful imprisonment (served consecutively).  Thus, the total range, including weapon enhancements, was 132 to 166 months.  Defense counsel agreed with the above calculation and requested a sentence at the low end of the range.  The court imposed a mid-range sentence of 124 months for the assault, with a concurrent sentence of 8 months for the unlawful imprisonment.  Adding the weapon enhancements (30 months) resulted in a total sentence of 154 months.

(Dkt. 17, Ex. 2 at 1-5.)

## PROCEDURAL BACKGROUND

Petitioner appealed his judgment and sentence to the Washington Court of Appeals and, on March 5, 2012, the Court of Appeals issued an unpublished opinion affirming the judgment and sentence.  (*See id*., Exs. 2, 3, 4, 5, and 6.)  Petitioner did not seek review of the Court of Appeals' decision, and the Court of Appeals issued its mandate terminating direct review on May 18, 2012.  (*Id*., Ex. 7.)  On October 11, 2013, petitioner filed a motion to recall the mandate in his direct appeal, and that motion was denied on December 13, 2013 .  (*Id*., Exs. 8 and 11.)

On May 7, 2013, petitioner filed a personal restraint petition in the Washington Supreme Court.  (*See id*., Exs. 12, 13, 14, 15, and 16.)  The Supreme Court Commissioner issued a ruling denying petitioner's personal restraint petition on December 20, 2013.  (*Id*., Ex. 17.)  Petitioner thereafter filed a motion to modify the Commissioner's ruling, and that motion was denied on April 2, 2014.  (*Id*., Ex. 19.)  The Supreme Court issued a certificate of finality in petitioner's personal restraint proceedings on April 9, 2014.  (*Id*., Ex. 20.)

REPORT AND RECOMMENDATION - 4

GROUNDS FOR RELIEF

Petitioner identifies the following two grounds for relief in this federal habeas action:

1)  The trial court violated 18 U.S.C., § 3161, and the Sixth Amendment to the U.S.C., when it granted an 'ends of justice' continuance on May 28, 2010. Thereby causing the trial to occur outside the time allowed, pursuant to:  18 U.S.C., § 3161 and the Sixth Amendment to the United States Constitution.

2)  The trial court violated petitioner's constitutional rights to due process and a fair trial, pursuant to :  Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

(*See* Dkt. 8, Memorandum of Points and Authorities at 5.)

DISCUSSION

Respondent concedes in his answer to petitioner's federal habeas petition that petitioner arguably exhausted his state court remedies by fairly presenting his claims to the state courts for review.  Respondent argues, however, that petitioner is not entitled to relief with respect to any of his claims.

Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or if the decision was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  Under the

REPORT AND RECOMMENDATION - 5

"unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *See Williams*, 529 U.S. at 407-09.

The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). The Supreme Court has further explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Clearly established federal law, for purposes of AEDPA, means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 U.S. at 71-72. "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)). If a habeas petitioner challenges the determination of a factual issue by a state court, such determination shall be presumed correct, and the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

<u>Speedy Trial</u>

Petitioner asserts in his first ground for federal habeas relief that the trial court violated his right to a speedy trial when it granted continuances on May 28, 2010 and July 2, 2010 which

did not further the ends of justice.  (*See* Dkt. 8, Memorandum of Points and Authorities at 6.)

The Sixth Amendment guarantees an accused the right to a "speedy and public trial." U.S. Const Amend. VI.  This right is imposed on the states by the Due Process Clause of the Fourteenth Amendment.  *Klopferer v. North Carolina*, 386 U.S. 213 (1967).  The United States Supreme Court has long held that "[t]he right of a speedy trial is necessarily relative.  It is consistent with delays and depends upon circumstances."  *Beavers v. Haubert*, 198 U.S. 77, 87 (1905).  Thus, "inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case."  *Barker v. Wingo*, 407 U.S. 514, 522 (1972).

In *Barker*, the Supreme Court identified four factors that should be considered when evaluating speedy trial claims.  Those four factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial, and (4) the prejudice to the defendant. These four factors are related and must be considered together with other circumstances relevant to a particular case.  *Barker*, 407 U.S. at 533.

The Washington Court of Appeals, on direct appeal, identified the relevant factors that must be balanced to determine whether a defendant's constitutional speedy trial rights have been violated, and then concluded as follows:

> Considering the totality of the circumstances, we find no constitutional speedy trial violation.  The record indicates several early defense requests to continue granted by the court to evaluate Jeffery's mental status.  Jeffery specifically contests the trial court's grant of two later continuances, both of which his counsel requested but he opposed.  The trial court had legitimate reasons for granting each continuance.  It balanced the competing interests of accommodating trial preparation, scheduling concerns, and securing Jeffery's constitutional rights.  It stated explicitly that it granted the continuances over Jeffery's objection to ensure defense counsel had an adequate opportunity to prepare for trial.  We conclude Jeffery suffered no violation of his constitutional right to a speedy trial.

(Dkt. 17, Ex. 2 at 16.)

REPORT AND RECOMMENDATION - 7

Petitioner fails to demonstrate that this decision of the Court of Appeals was objectively unreasonable. The record before this Court reflects that charges were filed against petitioner on June 26, 2009, and he was arraigned on June 29, 2009. (Dkt. 17, Ex. 23.) Petitioner's trial was initially set for August 14, 2009. (*Id*., Ex. 14 at Ex. 3.) The trial court thereafter granted eight continuances and petitioner eventually proceeded to trial on August 23, 2010. (*See id*., Ex. 14 at Exs. 4-11.) Six of the eight continuances were agreed, and some of those were apparently requested by defense counsel in order to have petitioner's mental status evaluated. (*See id*., Ex. 2 at 16, Ex. 14 at Exs. 4-9 and Ex. 21 at 4.) The final two continuances, those which petitioner complains of in this action, were requested by defense counsel for the purpose of obtaining additional discovery and conducting defense interviews in preparation for trial. (*See id*., Ex. 14 at Exs. 10 and 11.) The trial court granted the continuances over petitioner's objection. (*See id*., Exs. 21 and 22.)

While the overall delay in petitioner's case, a total of about fourteen months, was somewhat lengthy, the portion of the delay which petitioner complains of was just over 70 days.[6] This portion of the delay was attributable to defense counsel's need to prepare for trial and to the fact that both the prosecutor and defense counsel were waiting for information from the FBI which was conducting its own investigation into the case. (*See* Dkt. 17, Exs. 21 and 22.) The FBI was at that point in possession of petitioner's computer and was conducting a search of petitioner's hard drive. (*See id*., Ex. 21 at 4 and Ex. 22 at 9.) The prosecutor anticipated that the evidence received from the FBI would result in amendment of the charges against petitioner to add another assault charge. (*Id*., Ex. 21 at 1-2 and Ex. 22 at 8-11.)

---

[6] Petitioner agreed to continuances through June 11, 2010, and objected to the remaining two continuances which extended the trial date first to August 6, 2010, and then to August 20, 2010. (*See* Dkt. 17, Ex. 14 at Exs. 4-11.) As noted above, petitioner proceeded to trial on August 23, 2010, 73 days after the final agreed trial date.

REPORT AND RECOMMENDATION - 8

Once the information was received from the FBI the first week of July 2010, the state decided not to amend the charges but defense counsel, who reasonably held off conducting witness interviews while awaiting the information from the FBI, then required additional time to conduct those interviews and prepare for trial.  (*See* Dkt. 17, Ex. 22.)  While petitioner objected to these additional delays, they were necessary in order to ensure that his counsel was adequately prepared to defend him at trial.  Failure to grant these continuances would likely have implicated other constitutional concerns.

Finally, petitioner makes absolutely no showing that he was prejudiced by the delays he complains of.  And, absent proof of particularized prejudice, a petitioner must show that an excessive delay in the proceedings was attributable to government bad faith or negligence.  *See Doggett v. United States*, 505 U.S. 647, 656-58 (1992).  Petitioner makes no such showing here. The state courts reasonably concluded that petitioner had established no violation of his constitutional right to a speedy trial and, thus, petitioner's federal habeas petition should be denied with respect to that claim.

<u>Issuance of Mandate</u>

Petitioner asserts as a part of his second ground for relief that the mandate in his case was filed and finalized in violation of due process.  (Dkt. 8, Memorandum of Points and Authorities at 14-15.)  Petitioner's explanation of this claim in his federal habeas materials is brief and somewhat unclear.  (*See id*.)  However, a review of the state court record clarifies that this issue relates to motions filed by petitioner after the Court of Appeals issued its decision on direct appeal which petitioner believes were decided without a fair hearing.

The record reflects that after the Court of Appeals issued its decision on petitioner's direct appeal, petitioner filed *pro se* motions in the Court of Appeals seeking new counsel and

REPORT AND RECOMMENDATION - 9

1    additional time to file a motion for reconsideration.  (*See* Dkt. 17, Ex. 8.)  The state filed a

2    response to those motions, but did not serve a copy of the response on petitioner, apparently

3    because petitioner was still represented by counsel at that time.  (*See id*., Exs. 8 and 9.)

4    Petitioner's motions were subsequently denied, without him having had an opportunity to

5    respond to the state's arguments, and issuance of the mandate followed just over a month later.

6    (*See id*., Exs. 7 and 8.)

7        Almost 17 months after the mandate issued, petitioner filed in the Court of Appeals a

8    motion to recall the mandate pursuant to Washington Rule of Appellate Procedure (RAP)

9    12.9(b).  (Dkt. 17, Ex. 8.)  RAP 12.9(b) provides that the appellate court may recall a mandate

10   "to correct an inadvertent mistake or to modify a decision obtained by the fraud of a party or

11   counsel in the appellate court."  Petitioner argued in his motion to recall the mandate that he had

12   been denied the opportunity to respond to the state's arguments in opposition to his motions for

13   new counsel and for additional time to file a motion for reconsideration, and that this constituted

14   a violation of his due process rights warranting recall of the mandate.  (*Id*.)  The state filed a

15   response to petitioner's motion to recall the mandate, and petitioner filed a reply brief in support

16   of his motion.  (*Id*., Exs. 9 and 10.)  The Court of Appeals, after considering all briefing of the

17   parties, denied the motion to recall the mandate under RAP 12.9.  (*Id*., Ex. 11.)

18       Respondent argues in these proceedings that petitioner's claim regarding issuance of the

19   mandate is not cognizable in this federal habeas proceeding.  Respondent is correct.  A writ of

20   habeas corpus may issue only upon a finding that a prisoner is "in custody in violation of the

21   Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).  Federal habeas

22   relief does not lie for errors of state law. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)(citing *Pulley*

23   *v. Harris*, 465 U.S. 37, 41 (1984)).  The United States Supreme Court has made clear that it is

REPORT AND RECOMMENDATION - 10

1  not the province of federal habeas courts to re-examine state court conclusions regarding matters

2  of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  The concern of the federal court in

3  conducting habeas review is deciding whether a petitioner has suffered a violation of his federal

4  constitutional rights.  *See id.*

5       The timing of the issuance of the mandate by the Washington Court of Appeals is a

6  matter of state law.  The Court of Appeals' determination that petitioner was not entitled to recall

7  of the mandate under the provisions of RAP 12.9(b) was likewise a matter of state law.

8  Accordingly, petitioner's claim regarding issuance of the mandate is not subject to review in this

9  federal habeas proceeding.

10                                    Excessive Bail

11       Petitioner also asserts as a part of his second ground for relief that the pretrial bail

12  amounts established by the trial court were excessively high and violated his rights under the

13  Eighth and Fourteenth Amendments.  (Dkt. 8, Memorandum of Points and Authorities at 20-24.)

14  Respondent argues that this claim is moot.  He is correct.

15       In general, a case becomes moot when a party lacks a "legally cognizable interest in the

16  outcome."  *United State Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (quoting *Powell*

17  *v. McCormack*, 395 U.S. 486, 496 (1969)).  In *Murphy v. Hunt*, 455 U.S. 478 (1982), the

18  Supreme Court concluded that under this general rule, a constitutional claim to pretrial bail

19  becomes moot once a defendant is convicted.  *Id.*  at 481-82.  The Court explained that such a

20  question is no longer "live" following conviction because even a favorable decision on the claim

21  would not entitle the defendant to bail.  *See Murphy*, 455 U.S. at 481-82.

22       There is no question that petitioner was convicted on the charges for which the pretrial

23  bail amounts at issue were established, nor is there any question that petitioner is currently

REPORT AND RECOMMENDATION - 11

1    serving the sentence imposed as a result of that conviction.  Petitioner's claim regarding his

2    pretrial bail amounts is therefore moot.

3                                    Prosecutorial Misconduct

4           Finally, petitioner includes in his second ground for relief claims alleging prosecutorial

5    misconduct.  Specifically, petitioner claims that prosecutorial mismanagement caused delays in

6    his case and that the prosecutor committed misconduct during closing argument.  (*See* Dkt. 8,

7    Memorandum of Points and Authorities at 15-20.)

8           When a prosecutor's conduct is placed into question, unless the conduct impermissibly

9    infringes on a specific constitutional right, the standard of review is the "narrow one of due

10   process, and not the broad exercise of supervisory power."  *Darden v. Wainwright*, 477 U.S. 168,

11   181-82 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 642-43 (1974).  To obtain relief on a

12   claim of prosecutorial misconduct, a federal habeas petitioner must do more than show that "the

13   prosecutor's remarks were undesirable or even universally condemned."  *Darden*, 477 U.S. at

14   180-81.  A petitioner must demonstrate that the allegedly improper comments made by the

15   prosecutor "so infected the trial with unfairness as to make the resulting conviction a denial of

16   due process."  *Id.* at 181 (quoting *Donnelly*, 416 U.S. at 643).

17          In order to assess a claim that a prosecutor's comments rendered a trial so fundamentally

18   unfair as to deny a petitioner due process, it is necessary to examine the entire proceedings and

19   place the prosecutor's statements in context.  *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987).

20   A reviewing court must keep in mind that during closing argument a prosecutor has wide latitude

21   to make reasonable inferences based on the evidence.  *United States v. Molina*, 934 F.2d 1440,

22   1445 (9th Cir. 1991).

23

REPORT AND RECOMMENDATION - 12

Prosecutorial misconduct which rises to the level of a constitutional violation nonetheless provides a basis for federal habeas relief only if the misconduct is deemed prejudicial under the test announced by the Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *See Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004).  Under *Brecht*, habeas relief may be granted only if an error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

### 1.      *Delay Attributable to Prosecutor*

Petitioner asserts that the prosecutor concealed from the court facts relevant to its decisions regarding the granting of continuances.  Petitioner complains that the prosecutor represented to the court at the May 28, 2010 hearing on defense counsel's request for a continuance that it would be amending the charges to add deadly weapon enhancements to the first degree assault and unlawful imprisonment charges set forth in the original information when, in fact, the original charging document already included the deadly weapon enhancements.  (*See* Dkt. 8, Memorandum of Points and Authorities at 15-16.)

Petitioner also complains that the prosecutor failed to inform the court at either the May 28, 2010 hearing, or the July 2, 2010 hearing on defense counsel's final request for a continuance, that another assault charge which the prosecution anticipated adding to the case by way of an amended information was not related to the existing charges, or that additional potential evidence taken from petitioner's computer, and used to justify the continuances which petitioner objected to, was not related to the charges on which he was originally arraigned.  (*See id*. at 16-17.)

The Washington Court of Appeals, on direct appeal, rejected petitioner's claim that the prosecutor mismanaged the case relative to the proposed amendment of charges and the delays

REPORT AND RECOMMENDATION - 13

attributable thereto.  (Dkt. 17, Ex. 2 at 16-17 n.12.)  Petitioner fails to demonstrate that this

decision of the Court of Appeals was objectively unreasonable.

 To the extent petitioner complains that the prosecutor falsely represented to the court that

the charges against him would be amended to add deadly weapon enhancements, petitioner

shows no prejudice whatsoever.  While the record confirms that the deadly weapon

enhancements were included in the original charging document, the prosecutor's representation

that such an amendment would be forthcoming, whether or not it was intended to mislead the

court, did not contribute to any delay in the proceedings.

 To the extent petitioner complains that the prosecutor failed to inform the court that the

proposed new assault charge and the potential evidence from his computer were not related to

the existing charges, he is largely incorrect.  At the July 2, 2010 hearing on the final motion for

continuance, the trial court queried the prosecutor on the relationship between the original

charges and the proposed new charge.  (*See* Dkt. 17, Ex. 22.)  The prosecutor explained that the

state had been anticipating adding a new assault charge based on evidence obtained from the FBI

that petitioner had been poisoning his wife with Ricin and/or other materials found in their home.

(*Id*., Ex. 22 at 9.)  The prosecutor further explained that there was a potential theory of the case

that the originally charged assault was the culmination of a year-and-a-half long effort by

petitioner to kill his wife.  (*Id*., Ex. 22 at 10.)

 Thus, the record makes clear that the trial court had the information at the July 2 hearing

which petitioner believes was necessary for it to make a fully informed decision on the final

motion for continuance.  While this same information was not provided to the Court at the May

28, 2010 hearing, the record makes clear that the potential amendment of the charges was not the

only factor driving the request for a continuance at that time.  Petitioner's counsel explained to

REPORT AND RECOMMENDATION - 14

the court at that hearing that he had been preparing for a murder trial for another client for the preceding three weeks and that he had had to put his preparation for petitioner's case on hold during that period of time.  (*See* Dkt. 17, Ex. 21 at 2.)  Defense counsel further explained that he still had a number of people to interview in petitioner's case and evidence that he had to review.  (*See id*.)  Delays requested by, and attributable to, the defense cannot be charged to the state.  *See Vermont v. Brillon*, 556 U.S. 81, 92-93 (2009).

There is simply no evidence in the record that prosecutorial mismanagement caused excessive delays or denied petitioner a fair trial.  Accordingly, petitioner's federal habeas petition should be denied with respect to this portion of petitioner's prosecutorial misconduct claim.

### *2.   Closing Argument*

Petitioner asserts that the prosecutor misrepresented the evidence in her closing argument.  Specifically, petitioner complains about the prosecutor's argument that petitioner removed his fanny pack during his assault on his wife and that no blood was found on the fanny pack, and the prosecutor's multiple references to petitioner's guns.  (Dkt. 8, Memorandum of Points and Authorities at 17-20.)

The Washington Court of Appeals rejected petitioner's challenge to the prosecutor's closing argument on direct appeal, concluding that the challenged comments "expressed reasonable inferences from evidence presented at trial."  (Dkt. 17, Ex. 2 at 14.)  Petitioner fails to demonstrate that this decision of the Court of Appeals was objectively unreasonable.

### a.  Fanny Pack

Petitioner claims that the prosecutor's argument suggested that petitioner wore the fanny pack before the incident whereas the testimony at trial indicated that petitioner was wearing the fanny pack during the incident.  (Dkt. 8, Memorandum of Points and Authorities at 17.)

REPORT AND RECOMMENDATION - 15

Petitioner contends that the prosecutor's comment was not only false, but she used that falsehood to support an argument for intent, the element which differentiates first degree assault from second degree assault.  (Dkt. 8, Memorandum of Points and Authorities at 18.)   Petitioner also complains that the prosecutor's argument that there was not blood on the fanny pack was not supported by any evidence.  (*Id*.)  Petitioner claims that there was no evidence as to whether or not there was blood on the fanny pack, and that there likely was blood on the fanny pack.

The trial transcript reveals that petitioner's wife was asked during direct examination what petitioner was wearing when he was preparing to leave the house to go to the bank.  (*See* Dkt. 17, Ex. 24 at 64-65.)  She replied that "He wore a bum bag, a fanny pack."  (*Id*., Ex. 24 at 65.)  Another state's witness, Everett Police Detective Timothy O'Hara, was shown a series of photographs during direct examination, two of which were relevant to the issue of the fanny pack, and was asked to describe what he saw in those photographs.  Detective O'Hara testified as follows:

Q      This is State's Exhibit 54.  What do we see here?

A      Off to the left, you're still in the entryway hallway there, but off to the left is that family room.  And these are the items that – this is how I found them.  There was a prescription bottle here, two prescription bottles here and a black fanny pack type thing.  That's the way I found it sitting there.

Q      Okay.  What's significant about that, if anything?

A      Well, we found our defendant's ID in it, and it's the fanny pack that Mrs. Marble said he was wearing during the incident.

Q      Okay.  That looks like a close-up of the same fanny pack.

A      It is

Q      Did you find any blood evidence on that fanny pack?

A      I don't believe so, no.

REPORT AND RECOMMENDATION - 16

Q       And this is State's Exhibit 56.  What do we see here?

A       This was a wallet that was sitting directly on top of the fanny pack, opened
        it up, and it's our defendant, Mr. Jeffrey Marble's driver's license.

(Dkt. 17, Ex. 25 at 191-92.)

During closing arguments, the prosecutor argued as follows:

What was his intent?  This case really comes down to, what was he
intending to do?  You can tell what his intent was in a few ways.

Caren[7] told you when they were leaving the house that morning, he put on
a black fanny pack, the fanny pack that you saw in the pictures.  Put it on to leave
the house when they were walking down the stairs.  Where was the fanny pack in
those pictures?  It was taken off.  It was next to the living room.

What was significant about it?  There's no blood on it.  There's no blood
on the fanny pack.  He wasn't wearing it when he was beating on her.  He took
that fanny pack off and he put it down on the ground where he dropped it before
he attacked her, because he knew what he was going to do.

(*Id*., Ex. 26 at 227-28.)

Petitioner complains that the prosecutor's argument that petitioner took the fanny pack off

and dropped it on the ground before attacking his wife was inconsistent with Detective O'Hara's

testimony that petitioner's wife said petitioner was wearing the fanny pack *during* the incident.

A review of the relevant testimony and argument, however, reveals that the prosecutor argued

reasonable inferences based on the evidence presented.  Petitioner's wife testified that he was

wearing the fanny pack before the attack, and the fanny pack was found on the ground after the

attack.  Petitioner's emphasis on Detective O'Hara's use of the word "during" in his testimony

regarding the relevance of the fanny pack does not render the prosecutor's argument false or

---

[7] For reasons that aren't clear from the record, the prosecutor consistently referred to the victim, Catherine Dunne, as "Caren" throughout proceedings before the trial court.

REPORT AND RECOMMENDATION - 17

improper.[8]  As to the prosecutor's comments regarding blood on the fanny pack, Detective

O'Hara's testimony that he didn't find any blood evidence on the fanny pack was sufficient to

permit the prosecutor to make the argument.  The fact that the fanny pack was never actually

tested for blood does not render to prosecutor's argument in this regard improper.

b.  Guns

Petitioner's wife testified on direct examination that petitioner owned guns, that he kept

his guns in his office at the bottom of the stairs, and that she thought petitioner was trying to

push her downstairs.  (Dkt. 17, Ex. 24 at 56-57 and 64.)  On redirect examination, petitioner's

wife testified that she felt petitioner's intent was to kill her because he tried to get her down the

stairs where his weapons were.  (*Id*., Ex. 24 at 99.)  Everett Police Officer Karen White testified

that she spoke with petitioner's wife following the incident, and that petitioner's wife made the

following comments:

> She said she thought that he was - - at the period when they were next to the
> stairwell, she said that he was - - she felt he was trying to drag her downstairs to
> kill her, and she thought she was going to die, and she didn't want her son to come
> home and find her dead.

(*Id*., Ex. 25 at 125-26.)  Finally, Detective O'Hara testified that he saw guns in petitioner's office,

and that there were rifles and handguns laid out, apparently on the floor, between the desk and

the door to the office.  (*See id*., Ex. 25 at 211-12.)

During closing argument, the prosecutor argued as follows:

> Let's look at what else tells us something about his intent.  The guns.
> Where were the guns? You heard Caren say that he had about six guns in the
> house that she knew of.  She doesn't know a whole lot about guns.  She knew he
> had some rifles, she new [sic] he had some pistols.  Where were the guns found?

---

[8]  Petitioner claims in his reply brief that the fanny pack was removed by an E.M.T. who was checking
petitioner for injuries after the attack, but no such evidence was presented at trial.

REPORT AND RECOMMENDATION - 18

Downstairs in his home office where he works every day laid out on the floor. Common sense tells you that's not how you store guns in a house. It's reasonable to assume he's not storing them that way every day.  Why are the guns out?

     What did Caren tell you?  Caren told you that when she was in the hallway, he was slamming her against that railing that you saw separated that slate floor from the stairs that led down to the guns. . . .

     . . . .

He couldn't get her downstairs where the guns were, his weapon of choice that day was a barbell. . . .

(Dkt. 17, Ex. 26 at 228-229.)

The prosecutor's comments regarding the guns were clearly based on testimony provided by state's witnesses at trial.  Petitioner's assertion in his memorandum of points and authorities in support of his petition, and in his reply brief, that the guns had nothing to do with the crimes is contradicted by the record.  (Dkt. 8, Memorandum of Points and Authorities at 19-20 and Dkt. 18 at 6.)  The fact that guns were not used in the commission of the crime does not make them irrelevant.  The prosecutor's argument in this regard was not improper.

The Court of Appeals reasonably concluded that the prosecutor's comments about petitioner's guns and fanny pack "expressed reasonable inferences from evidence presented at trial."  Accordingly, petitioner's federal habeas petition should be denied with respect to this portion of petitioner's prosecutorial misconduct claim.

<u>Certificate of Appealability</u>

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge.  A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right."  See 28 U.S.C. §

REPORT AND RECOMMENDATION - 19

2253(c)(3).  A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Under this standard, this Court concludes that petitioner is not entitled to a certificate of appealability with respect to any of the claims asserted in his petition for writ of habeas corpus.

<u>CONCLUSION</u>

For the reasons set forth above, this Court recommends that petitioner's amended petition for writ of habeas corpus be denied and that this action be dismissed with prejudice.  This Court further recommends that a certificate of appealability be denied with respect to all claims asserted by petitioner in this action.  A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit by no later than **September 18, 2015**.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motion calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **September 25, 2015.**

*//*

*//*

*//*

*//*

REPORT AND RECOMMENDATION - 20

1    This Report and Recommendation is not an appealable order.  Thus, a notice of appeal

2  seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the

3  assigned District Judge acts on this Report and Recommendation.

4    DATED this 28th day of August, 2015.

5  *James P. Donohue*

6  JAMES P. DONOHUE
   Chief United States Magistrate Judge

REPORT AND RECOMMENDATION - 21